The undersigned have reviewed the prior Opinion and Award based upon the record of proceedings before Deputy Commissioner Dollar. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * *
Any attachments to the Brief of the Plaintiff which were not admitted into evidence at the hearing before the deputy commissioner are hereby STRICKEN from the record.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On 13 July 1995, plaintiff was injured when a highboy sprayer he was driving hit a hole and fell over.
2. Defendant Taylor Manufacturing, Inc. (hereinafter called TMI) was a North Carolina corporation and was a duly qualified self-insured, with Riscorp as the servicing agent.
3. TMI had an umbrella policy of workers' compensation which was in effect on or about 13 July 1995, and which covered all of the Taylor Companies, including TMI, Taylor-Wilkes Helicopter Service, Inc. (hereinafter called TWHS), Taylor Products, Inc., and National Leasing Corp.
4. Plaintiff was employed by TMI from 1 November 1990 through 28 June 1990. He was then employed by TWHS from 28 June 1990 through 25 October 1990, and he returned to TMI from 25 October 1990 to 18 March 1991. Plaintiff was terminated from TMI on 18 March 1991, because the company considered him a health risk.
5. Plaintiff was performing work under a federal government contract with the USDA to spray witchweed on 13 July 1995.
6. The parties stipulated the following documentary evidence into the record:
 a. New Hanover Regional Medical Center Records, eighty pages,
 b. Southeastern Orthopaedic Clinic Records, eight pages,
 c. Duke University Medical Center Records, 116 pages,
 d. North Carolina Industrial Commission letters, two pages,
e. Report of Thomas Baldwin, nine pages,
f. Defendant's Responses to Plaintiff's Discovery, 119 pages,
 g. Plaintiff's Responses to Defendants' Discovery, twenty-four pages,
h. Insurance documents, five pages,
i. Bladen Medical Associates Records, twenty-five pages,
j. Industrial Commission Forms from files 722198 and 121630, and,
k. Witchweed contract and other relevant information, four pages.
 * * * * * * * * * * *
The Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was sixty-five years old at the time of the hearing before the deputy commissioner. He attended school through the third grade and is able to read and sign his name, but he is functionally illiterate. Plaintiff has worked as a farm hand, a lumber mill worker, a farm machine builder, a crop sprayer, and as a self-employed mechanic.
2. From 1961 through 1974, plaintiff was employed during the months of March through October by TWHS to prepare and maintain crop spraying equipment. For the remainder of the year, plaintiff was employed by Taylor-Wilkes Massey Ferguson where he repaired farm machinery. As the Taylor family owned both of these businesses, it was not unusual to assign the employees to work where they were needed.
3. Witchweed is a parasite which attacks blade crops. Since 1961, TWHS has been awarded the contract with the United States Department of Agriculture (hereinafter, "USDA") for spraying to eradicate witchweed. At one time, the USDA awarded contracts for up to 50,000 acres per county. However, due to the success of the spraying, witchweed is largely under control in Southeastern North Carolina. By 1994, the USDA allotted only 1,300 acres to TWHS for spraying.
4. In 1974, plaintiff quit his job with defendants. He and his wife opened a convenience store and repair business which they operated for fourteen years, until his wife died in 1988.
5. In 1989, Ron Taylor rehired plaintiff to work at TWHS during the witchweed season and at TMI for the rest of the year. Plaintiff was paid $400.00 per week.
6. On 23 January 1991, plaintiff sustained a compensable on-the-job injury which was the subject of I.C. File No. 121630. Plaintiff received six weeks of benefits for this injury.
7. On 18 March 1991, TMI terminated plaintiff's employment. Personnel records reflect that plaintiff was not to be rehired because he was considered a health risk. At all times while employed by TMI or TWHS before 18 March 1991, plaintiff received a W-2 form from his employer which reflected the withholdings from his pay for taxes and social security. Plaintiff was an employee of TMI or TWHS while performing services for the respective company.
8. In 1992, plaintiff negotiated with Ron Taylor, in Taylor's capacity as president of TWHS, to allow plaintiff to perform TWHS's contract with the USDA. Plaintiff and Taylor agreed that plaintiff would not be hired as an employee but would be hired as an independent contractor. Plaintiff understood that Taylor and defendant-employers were unwilling to rehire him as an employee.
9. In the years from 1992 through the date of the injury in 1995, plaintiff performed witchweed spraying as he had when defendants recognized him as an employee, with a few exceptions: plaintiff was hired and paid only by TWHS and only during the witchweed season, and TWHS issued a IRS Form 1099 at the end of the year and did not deduct taxes from plaintiff's pay. As was the situation when plaintiff was an employee with defendants, an employee of TMI ordered all of plaintiff's spraying parts and chemicals for the spraying jobs, and TMI employees delivered a highboy tractor to the job sites for plaintiff's use. Plaintiff's primary assistant, Cleo McCoy, was an acknowledged employee of defendants. Plaintiff used TWHS equipment, parts, and water. On days when inclement weather prevented plaintiff from spraying, he worked at the main TMI plant driving a forklift and doing odd jobs at the direction of Ron Taylor or TMI employees; however, there is no evidence that TMI did or did not pay plaintiff for these services. Because of his years of experience, plaintiff needed no supervision from TWHS in the performance of his spraying duties. USDA agents directed plaintiff to the various fields to be sprayed and remained on site to view the spraying. Plaintiff performed spraying only for TWHS and was not engaged in an independent business or occupation, did not hire his own assistants, and worked for TWHS under the supervision of the USDA.
10. Before plaintiff returned to work for TWHS in 1992, he signed a subcontractor's waiver of workers' compensation coverage at Ron Taylor's request. Plaintiff signed this agreement voluntarily. The agreement provided that it was to be effective until the expiration date of TWHS's then-current workers' compensation policy, which was renewable yearly. However, there is no evidence that, in 1992, TWHS or Ron Taylor agreed to hire plaintiff in any subsequent witchweed season, nor is there any evidence that the waiver signed in 1992 was applicable in any subsequent year in which plaintiff might be hired, including 1995.
11. At the end of the witchweed season in 1992, TWHS's contract with USDA in 1992 was concluded. TWHS's contract in 1995 was a new contract for witchweed spraying. Likewise, plaintiff's employment with TWHS in 1995 was a new contract for performing the spraying.
12. In 1992, TWHS paid plaintiff $9,890.00 for witchweed spraying and provided plaintiff an IRS Form 1099. No taxes or social security were withheld.
13. In 1993, TWHS paid plaintiff $14,248.80 for witchweed spraying and provided plaintiff an IRS Form 1099.
14. In 1994, plaintiff asked that his paychecks be made payable to his wife Faye. He provided Faye's social security number to defendants for the payroll forms. In 1994, TWHS paid $11,600.00 to Faye Davis and provided her an IRS Form1099 even though plaintiff was providing the witchweed spraying services.
15. In 1995, TWHS provided Faye Davis an IRS Form 1099 indicating payments of $5,950.00 that had been paid for plaintiff's services. Of this amount, $3,300 was paid after plaintiff's injury. If he had not been injured, plaintiff would have earned an additional $1,104.75, which was the amount paid to Cleo McCoy based on the number of acres sprayed after 13 July 1995, at $1.25 per acre. Thus, if plaintiff had not been injured, he would have earned $7,054.75 in 1995.
16. As a result of the sprayer accident, plaintiff suffered a left anterior shoulder dislocation. A closed reduction procedure was performed on 13 July 1995.
17. A CT scan revealed that plaintiff suffered from a 20% glenoid fracture in his left shoulder, and ultimately a tear was discovered in plaintiff's left rotator cuff. It was also noted that plaintiff suffered from alvular heart disease and prostate cancer. On 29 July 1996, plaintiff underwent mitral valve replacement surgery and coronary artery bypass grafting.
18. In October 1996, plaintiff suffered a frozen left shoulder following continuing problems related to his injury of 13 July 1995. On 22 October 1996, plaintiff underwent surgery for an arthroscopic anterior and posterior capsular release and subacromial perihumeral debridement.
19. On 24 February 1997, plaintiff underwent cystoscopy, bilateral pelvic lymphadenectomy and radical retropubic prostatectomy surgery for his prostate cancer condition.
20. A Report of Vocational Evaluation performed on 4 December 1997 revealed that despite the surgery on plaintiff's left shoulder, his left arm remains functionally useless. Therefore, plaintiff is without the bi-manual dexterity required to perform as a diesel mechanic or as a tractor operator, jobs that he has previously performed, and he does not possess transferable skills to jobs within his residual functional capacity. Given plaintiff's education, low IQ, illiteracy, and age, he is not a candidate for retraining in another field. For these reasons, plaintiff is no longer a viable candidate for competitive employment, and he is permanently and totally disabled.
21. Plaintiff's failure to file a Form 18 Notice of Accident within 30 days of the injury as required by the Act was due to both parties' assumption that plaintiff was not an employee entitled to workers' compensation but was an independent contractor as they had agreed. Plaintiff's excuse is found reasonable. Defendants had actual knowledge of plaintiff's accident within a few hours of the incident. Defendants denied plaintiff's claim based on their contention that plaintiff was an independent contractor, pursuant to the parties' agreement. Defendants were not prejudiced by plaintiff's failure to give written notice within 30 days.
22. Plaintiff filed his claim for compensation under the Act within two years of the date of injury.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Defendant Taylor-Wilkes Helicopter Service, Inc., could not by contractual agreement absolve itself of responsibility under the Act to provide workers' compensation for plaintiff, if plaintiff would otherwise be covered under the Act. G.S. 97-6;Hoffman v. Ryder Truck Lines, Inc., 306 N.C. 502, 293 S.E.2d 807
(1982); Grouse v. DRB Baseball Management, Inc.,121 N.C. App. 376, 465 S.E.2d 568 (1996). Despite the parties' attempt in this case to designate their relationship by contract, their actual relationship is a legal question. Williams v. ARL, Inc., ___ N.C. App. ___, ___, 516 S.E.2d 187, ___ (1999).
2. Applying case law principles, plaintiff was an employee of defendant Taylor-Wilkes Helicopter Service, Inc., and was not an independent contractor when he was injured on 13 July 1995. G.S. 97-2(2); see Hayes v. Board of Trustees of ElonCollege, 224 N.C. 11, 29 S.E.2d 137 (1944).
3. Even if plaintiff could be considered an independent contractor, he would be a subcontractor of defendant Taylor-Wilkes Helicopter Service, Inc., with no employees, hired to perform the contract between defendant Taylor-Wilkes Helicopter Service, Inc., and the USDA. Under G.S. 97-19, as it was written at the time of plaintiff's injury, defendant Taylor-Wilkes Helicopter Service, Inc., would be liable to plaintiff as subcontractor unless plaintiff waived in writing his right to workers' compensation. As there is insufficient evidence that a valid waiver was in effect on 13 July 1995, plaintiff would be entitled to workers' compensation benefits from defendant Taylor-Wilkes Helicopter Service, Inc., as a subcontractor. G.S. 97-19 (1994) (subsequently amended).
4. Plaintiff's injury arose out of and in the course of his employment with defendant Taylor-Wilkes Helicopter Service, Inc., and plaintiff is entitled to compensation under the Act. G.S.97-2.
5. Plaintiff's employment was seasonal in nature. The proper method of calculating the average weekly wage in this case is to take plaintiff's annual income while working for TWHS and divide that number by 52. Barber v. Going West Transp., Inc.,
___ N.C. App. ___, 517 S.E.2d 914 (1999), citing Joyner v.Oil Co., 266 N.C. 519, 146 S.E.2d 447 (1966). Even though plaintiff did not work the full season in 1995, it would not be equitable to calculate plaintiff's average weekly wage based on the amount he earned during the 1994 season, which was $11,600.00, because the number of acres available for witchweeding was declining from year to year, and plaintiff's salary in 1994 would not fairly reflect the wages he was earning at the time of his injury. The amount plaintiff would have earned in 1995, or $7,056.75, divided by 52, more nearly approximates the amount plaintiff would be earning were it not for the injury. Accordingly, plaintiff's average weekly wage for the purpose of calculating his compensation rate is $135.71, which yields a compensation rate of $90.38. G.S. 97-2(5).
6. Due to his compensable injury, plaintiff is permanently and totally disabled; therefore, he is entitled to compensation in the weekly amount of $90.38, beginning on 13 July 1995 and continuing for the remainder of his life. G.S. 97-29.
7. Plaintiff is entitled to medical compensation for any treatment he has received or may receive in the future which is related to his compensable injury and which is reasonably calculated to effect a cure, give relief, or lessen the period of plaintiff's disability. G.S. 97-25.
8. Defendant Taylor-Wilkes Helicopter Service, Inc., and defendant carrier are entitled to a credit for unearned wages paid by defendant Taylor-Wilkes Helicopter Service, Inc., to plaintiff following his 13 July 1995 injury by accident, which credit shall be deducted from the accrued lump sum due plaintiff. G.S. 97-42.
9. Defendant Taylor-Wilkes Helicopter Service, Inc., and defendant carrier did not defend this claim without reasonable ground. G.S. 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant Taylor-Wilkes Helicopter Service, Inc., and defendant carrier shall pay plaintiff the weekly amount of $90.38, beginning on 14 July 1995 and continuing for the remainder of his lifetime. This award shall be subject to attorney's fees awarded in paragraph 3. Any accrued amount shall be paid to plaintiff in a lump sum, subject to a credit for wages which defendant Taylor-Wilkes Helicopter Service, Inc., paid to plaintiff after 13 July 1995.
2. Defendant Taylor-Wilkes Helicopter Service, Inc., and defendant carrier shall pay for all medical treatment related to plaintiff's compensable injury which is or has been reasonably calculated to effect a cure, give relief, or lessen the period of plaintiff's disability.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of plaintiff's award in Paragraph 1 above. One-fourth of plaintiff's lump sum award, less the credit, shall be deducted from the amount due and forwarded directly to plaintiff's counsel; thereafter, every fourth weekly payment shall be made directly to plaintiff's counsel.
4. Plaintiff's motion for attorney's fees under G.S.97-88.1 is denied.
5. Defendant Taylor-Wilkes Helicopter Service, Inc., and defendant carrier shall bear the costs of this action.
 S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ _____________________ DIANNE C. SELLERS COMMISSIONER